**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE | : | CHAPTER 7 |
| MELANIE DENITTIS, | : | |
| DEBTOR | : | CASE NO.01-40744-JBR |
| MELANIE DENITTIS, | : | |
|     PLAINTIFF, | : | |
| v. | : | Adv. Pro. No .06-4113 |
| EDUCATIONAL CREDIT | : | |
| MANAGEMENT CORPORATION, | : | |
|     DEFENDANT. | : | |

**MEMORANDUM OF DECISION**

This matter came before the Court for trial on the Debtor's amended complaint seeking a declaration that the student loan originally held by SallieMae Servicing Corp., which after a series of assignments is now held by Educational Credit Management Corporation ("ECMC"), is dischargable. For the reasons set forth herein, the Court finds that repayment of the Debtor's student loan would impose an undue hardship and thus judgment will enter for the Debtor.

**FACTS**

The Debtor is a 32 year old unmarried woman who suffers from relapsing, recurring Multiple Sclerosis ("MS"). She received a BS in communications disorders from Emerson College in 1995 and hoped to use her degree, in conjunction with her fluency in American Sign Language, to become a speech pathologist for hearing impaired individuals. Following her graduation she was employed teaching deaf children and also enrolled in an American Sign Language certificate program at Northeastern University. About a year ago, she enrolled in graduate school at Worcester State College to pursue a degree in health education. She was unable to complete the program due to a what she referred to as a "flare up" of her MS and has no plans to attempt to resume her education.

The Debtor is pregnant and for the last two years has been living at home with her parents and a sibling. She plans to continue living with her parents after her baby is born, which is expected to be sometime around March 31, 2007. In addition to MS, the Debtor also testified she suffers from Hashimoto's Disease, a disease of the thyroid. She is on medication for this disease but she is not currently taking any medication for her MS. She testified that she developed antibodies to Interferon, the prior medication she was taking for MS.

At trial the Debtor testified about her medical history, which testimony is supported by the medical records introduced in evidence,[1] and her current physical condition, the physical signs of which the Court was able to observe first-hand. There was no objection to the introduction of any of this evidence which the Court summarizes as follows.

In 1992, while the Debtor was a freshman in college, she developed a limp and had an abnormal gait. She described her knee as "snapping forward." These symptoms would disappear and reoccur over the course of the year. During this period, the Debtor also held two jobs: one in Emerson College's financial aid office and one as a cashier on weekends when she was home from school. Her symptoms, when they were present, interfered with her employment. She testified that on one occasion while working as a cashier, her legs became numb and she had to leave work to go to an emergency room. On another occasion, prior to the diagnosis being made, the Debtor was employed as a teacher at the Learning Center for Deaf Children in Framingham, Massachusetts and had what she described as "a major flare" that

---

[1] In July 2003 the Debtor was struck by a car and suffered knee sprains. Many of the medical records introduced at trial relate to the physical therapy treatments the Debtor received following the car accident.

resulted in her being essentially bed-ridden from February to April of the school year.[2] During this period, when her symptoms worsened, she was sent to physical therapy in attempts to improve her gait. The disease, however, remained undiagnosed.

In 1999 the Debtor was diagnosed with MS. At the time she was still teaching teacher at the Learning Center. Because the disease has affected her hands, she was unable to sign for long periods of time and thus she was unable to continue in this job. Despite her illness, the Debtor has made several attempts to find work that she would be physically able to perform. In October 1999 she worked part-time at Face-Makers, a retail store, but left after about two months because she was unable to stand up for the number of hours she was assigned to work. In 1999 she also worked as a make-up artist on a few occasions for a company that went out of business. The Debtor then went to work part-time at Filene's, another retail store, in the store's cosmetic department. Although the store made special accommodations, including permitting her to sit down at the make-up counter and allowing her to not wear a heavy woolen lab coat, the Debtor nevertheless required frequent and unscheduled breaks. As a result, she was unable to keep this job.

The Debtor pursued certification to teach yoga with the help of the Massachusetts Rehabilitation Commission. For a brief period, she worked as a yoga instructor at the Harvard Business School and received $45 a week to teach one class. She had to leave that employment for health problems related to her MS, however. In 2001 the Debtor started her own yoga business called the Yoga Garden. She generally taught one or two classes a week to

---

[2]There was no evidence as to the year in which this occurred, only that it occurred after graduation while she was employed at the Learning Center.

3

approximately three to seven students. Her disabled students paid what they could afford, usually $5 or $10, while non-disabled students paid $10. Typically she earned $30 to $40 a class. She no longer operates the business because of her MS; she had to stop when she was unable to keep her commitment to teach even one class for one hour per week. From March 2004 to October 2004 she taught yoga at the Worcester Fitness Center and was paid $25 per class. She remains on the Center's list of substitute teachers. She currently teaches yoga for an entity called Amethyst Point. From January 1, 2006 until the date of trial, November 30, 2006, the Debtor estimated she earned $500 with Amethyst Point and zero from her own business. The Debtor would like resume teaching yoga in the future if her physical condition permits.

  The Debtor has made several other attempts to obtain and maintain employment but her medical condition renders her ability to work on a consistent basis impossible. She is qualified as a sign language interpreter but because of her symptoms is unable to perform this type of work. The Debtor testified that within the past year she also sought employment as a freelance make-up artist. She worked one 5 hour shift which resulted in her symptoms increasing. She was unable to return to this job. Since December 2000 she has periodically worked for Matthew Bender Publishing, specifically LEXIS/NEXIS, as a medical writer when she is able. She only takes assignments when she believes she is physically able to handle the work. Sometimes she has had to give up contracts or, on several occasions, request extensions. She has also sought but has been unable to obtain similar work with other publishers.

  The Debtor testified that she has numbness and weakness in her legs; sometimes her calves, especially her left, become spastic and her toes curl up, making it difficult to walk. She has uncontrolled movements in her arms, which the Court was able to observe. In fact, as the

Debtor's testimony continued and she appeared to become upset, the Court observed the Debtor struggling to take a sip of water without spilling the liquid and although it appeared that the Debtor was attempting to minimize or hide the fact that some of the water spilled from the cup as she was trying to drink, the Court saw how difficult even this simple task was for her. She also suffers from stiffness in her hands and wears wrist splints. She has to urinate frequently. Her symptoms are exacerbated by heat and fatigue.

The Debtor also testified that she is currently in a remission state, which she testified is defined by the absence of an inflammation of the myelin sheath. Despite the Debtor's disease being in a remission state, her symptoms are still active. When in a remitting state, the Debtor tries to manage her life to avoid fatigue and from becoming overly stressed. She testified that her body dictates her activity level and she cannot determine how functional she will be at any given future time. When she is in a flare condition, her symptoms are much worse than those she is currently exhibiting. During a flare, it is difficult for her to get from her bed to the bathroom; she has difficulty lifting a cup to her mouth. She sometimes requires assistance with meal preparation and sometimes she is unable to drive. She sometimes required assistance with injections when she was taking medication for her MS.

The Debtor's primary source of income is Social Security Disability Income of $550 per month, which was to increase to $568 per month beginning December 2006. Although the evidence shows that the Administrative Law Judge "made a fully favorable decision" regarding the Debtor's request for social security benefits, there was no evidence as to whether the Debtor sought permanent, rather than temporary, benefits. In addition to the SSDI benefits, the Debtor receives $533 per month from long-term disability insurance, which was awarded beginning in

June 2006. There was no evidence of whether or how long the long-term disability payments will continue or whether they will increase. At trial the Debtor testified that her total income from all sources for 2006 will be approximately $10,000.

In December 2005 the Debtor received $12,000 from a lawsuit related to the 2003 incident when she was struck by a car. In May or June 2006 she received a long-term disability lump sum payment of $27,000 and in June used $8,000 as a down-payment on a used 2006 Toyota Matrix. She also repaid money she had borrowed from her parents and sister for living expenses as well as some credit card bills she had also used for living expenses.[3] She did not use any portion of the $12,000 or the $27,000 to pay toward the student loan.

The Debtor's schedules, which were prepared and filed in 2001, were also introduced at trial. Schedule J, along with the Debtor's testimony, provide a picture of a young woman, whose lifestyle is far from lavish. Based on the Debtor's testimony, while the amounts of some of her expenses have changed, her lifestyle remains the same.[4] She has no rental expenses because her parents do not charge her rent. Because she intends to continue to live with her parents following the birth of her child, there is no deduction for anticipated rent payments. She lists her current monthly expenses as follows:

---

[3]That the Debtor needed to borrow money to live is supported by her tax returns which show adjusted gross income of $2,886 for 2001; $1,735 for 2002; $4,114 for 2003; and $696.64 for 2004.

[4]The Debtor's counsel submitted a trial brief in which he listed the Debtor's current monthly expenses. The list of expenses contained in the trial brief indicate that while some expenses, including amount spent for medicine, have increased from what the 2001 Schedule J indicates, others have decreased. With the agreement of the parties and subject to ECMC's right to cross-exam, the Court accepted the list of expenses, although not separately marked as an exhibit, as a summary of the Debtor's testimony regarding the nature and amounts of her monthly expenses in light of the Debtor's physical condition.

| | |
|---|---|
| Car payment:[5] | $151 |
| Gas: | $150 |
| Yoga Insurance: | $14 |
| Car Maintenance: | $40 |
| Insurance:[6] | $85 |
| Yoga Supplies: (When working) | $50 |
| Groceries: | $250 |
| Phone: | $70 |
| Clothing: | $100 |
| Medicine: | $250 |
| Meals: | $60 |
| Miscellaneous: | $200 |
| Other: | $190 |
| TOTAL: | $1510 |

On cross-examination, the Debtor testified that she spends approximately $40 a month on car maintenance, including such items as oil changes, which she estimated cost about $35.00. Although this figure may be bit high for just an oil change, there are other components to car maintenance. Moreover since there is no additional money budgeted for emergency car repairs, such as a flat tire, the Court assumes that this figure includes such items as well. The Debtor also testified that she budgeted $50 a month for yoga materials, such as music, mats, straps, props, and clothing, although she acknowledged that she is not currently spending that amount as she is presently unable to teach yoga. She also testified that she spends $100 for miscellaneous items, including veterinary bills[7] and health and beauty items. She also budgets another $190 for

---

[5] The car payments will end in 2008.

[6] Neither attorney asked the Debtor about the nature of the insurance payments. It is reasonable to infer that this insurance payment is for automobile insurance. According to Schedule J, her automobile insurance payments in 2001 were $86 a month for the car she then owned, namely a 1993 Honda Accord with 140,000 miles on it.

[7] The Debtor testified that as recently as two weeks before the trial she had a veterinary bill of $34.

other expenses but was unable to describe how that money was applied.

She expects to live at home with her newborn because she does not have the resources to pay rent. Currently her expenditures exceed her income and she testified that she anticipates that her expenses will increase after her baby is born. She is not receiving support from the baby's father. He lives at home with his mother and currently works at Guitar Center. She does anticipate he will provide some financial support for the child after the baby is born; she does not know how much she will receive.

The Debtor is aware of the Ford Program and that one of its plans would lead to a zero payment. She was not aware of the Ford Program prior to the litigation, however, and learned of it when ECMC's attorney sent the Debtor's counsel a letter regarding the Ford Program. No one representing any of the holders of the student loans ever contacted her to discuss these options.[8]

Following the trial, the Court issues a "Order and Notice" that it intended "to take judicial notice of the definition and prognosis of individuals, including the Debtor, who have been diagnosed with relapsing, remitting Multiple Sclerosis" and listed three sources. The Court also set a date by which the parties could file objections and/or responses to the Notice and also invited the parties to suggest other sources of information. ECMC objected to this Court's taking judicial notice on the grounds "that the matters subject to be taken by judicial notice are subject to reasonable dispute..." even though ECMC argued that the case does not turn on the

---

[8]The Court admitted the letter from ECMC's attorney to Debtor's attorney without objection but notes that the letter appears to have been sent solely to create evidence of the payments that the Debtor would be required to make under each of the Ford repayment programs to be used at trial. The letter does not fully explain the implications of the program, however. For example, the letter does not inform the Debtor that a significant tax liability may result from the forgiveness of her student loan through the Ford program or the fact that future income may be garnished by the Internal Revenue Service to pay down the tax debt.

definition of MS or the Debtor's prognosis.[9]

**DISCUSSION**

The Debtor is entitled to a discharge of this loan only if she proves by a preponderance of the evidence that the repayment of the loan will impose an undue hardship on her. 11 U.S.C.A. § 523(a)(8). There are two test generally employed to determine whether repayment will impose such a hardship: the totality of the circumstances and the *Brunner* test. Some courts conclude that either test leads to the same outcome, a conclusion neither this Court nor the BAP have endorsed. "The significant difference between the Brunner approach and the totality of the circumstances test is the requirement in Brunner that a debtor demonstrate that she has made good faith efforts to repay the educational loans at issue." *ECMC. v. Kelly (In re Kelly)*, 312 B.R. 200, 206 (1st Cir. BAP 2004). "Under Brunner, the Debtor's failure to make a good faith effort to repay the loans would result in a conclusion of nondischargeability. Under the totality of circumstances approach, a debtor's failure to make a good faith repayment effort is an additional factor to be weighed, but not necessarily a determinative factor." *Id.* at 207. The First Circuit has not expressed a preference for either test, and this Court will continue to use the totality of the circumstances test as it has since adopting the analysis Judge Haines undertook in *Kopf v. United States Dept. of Educ. (In re Kopf)*, 245 B.R. 731, 737-41 (Bankr. D.Me.2000). *In re Dolan*, 256 B.R. 230, 238 (Bankr. D. Mass. 2000).

---

[9]ECMC inconsistently argued that the case did not turn of the definition of MS or the prognosis yet urged that the Debtor did not meet her burden of proof as she failed to introduce expert testimony regarding her prognosis. As discussed herein, the continually worsening of the Debtor's symptoms is strong evidence that it is more likely than not that she will not show sufficient improvement to permit her to find and hold employment that will have any meaningful impact on her finances.

9

Under the totality of the circumstances test, the Debtor must prove by a preponderance of the evidence, that (1) her past, present, and reasonably reliable future financial resources; (2) her and her dependents' reasonably necessary living expenses, and; (3) other relevant facts or circumstances particular to the Debtor's case are such that excepting the student loans from discharge will prevent the Debtor from maintaining a minimal standard of living, even with the advantage of a discharge of her other pre-petition debts. *Id.* It is not necessary that the debtor's standard of living rise to the level of "economic hopelessness," *id.* at 239, but as Judge Somma noted "the ordinary meaning of hardship [is] privation, a lack of basic life necessities or comforts, and undue hardship [is] a privation beyond reasonable limits." *In re Dufresne*, 341 B.R. 391, 395 (Bankr. D. Mass. 2006).

The Debtor's currently monthly income totals $1101: $568 (reflecting the December 1, 2006 increase) from SSDI and $533 from long term-disability insurance. Even if the Court eliminates all yoga expenses ($50 for supplies and $14 for insurance),[10] and the categories labeled "miscellaneous" ($100) and "other" ($190) in their entirety, the Debtor's expenses still exceed her income. The Debtor would have to give up her telephone and her gas money in addition to the foregoing to become even marginally solvent. If her financial status is not economically hopeless, it is certainly hovering in that area.

While it is true that the Debtor supplements her SSDI and long-term insurance payments with her employment, her income derived from that employment is minimal and sporadic. This Debtor has made Herculean efforts to both find work of a type she can perform and actually

---

[10] It is unclear whether the Debtor is required to carry this insurance in order to teach yoga.

10

work despite facing daunting physical obstacles. Using her past income as a guide to what she might hope to earn in the future, however, indicates her income is not likely to increase significantly. Moreover she will have increased expenses when her baby is born and it is unclear how much financial support she will get, or can even expect to get, from the baby's father.

ECMC questioned the Debtor about her decision not to use her lump sum payments toward repaying her student loan. She acknowledged that she did not use the money to repay any portion of the student loan but instead paid money her parents, her sister, and credit cards for the money she have borrowed to pay living expenses. This testimony is designed to elicit a finding that the debt is nondischargeable as the Debtor cannot satisfy the good-faith prong of the *Brunner* analysis, a test not adopted by this Court. Even assuming that the Debtor's choice to repay money she borrowed for living expenses rather than her student loan is evidence of a lack of good faith,[11] it is only one factor in the Court's analysis when weighing all the factors and which carry little weight given the debtor's overall condition.

Similarly ECMC introduced evidence of the William D. Ford Repayment programs, including the income contingent repayment program. Under the income contingent repayment program the Debtor would not be required to make any payments currently. In essence, it would hold the loan in abeyances, albeit with interest accruing, unless and until at some point within the 25 years after she entered the program, her income increased. There are several problems with this program including that the forgiveness of debt outside of bankruptcy results in a

---

[11]The Court questions whether her choice even shows a lack of good faith. While this Debtor does not rely upon the kindness of strangers, she clearly relies upon her parents and sister for financial assistance. In addition it is a reasonable inference that these are the very people upon whom she must heavily rely when a flare up of her MS exacerbates her physical symptoms.

taxable event[12] and that social security payments can be garnished to pay down these taxes. Most troubling about ECMC's attempts to force the Debtor into the Ford program, however, is that such use of the program removes from this Court's consideration the very issue Congress entrusted to the Court, namely the repayment of the debt would impose an undue hardship. To hold that debtors must participate in the Ford program, if eligible, would be no more than the Court abdicating its responsibility to determine the dischargeability of a student loan. If this is the outcome Congress intended, it would have said so, especially since Congress undertook a major revision to the Bankruptcy Code in the BAPCPA. Although there may be instances in which a debtor's voluntary participation in the Ford program is the best solution to a debtor's financial predicament, such as when a debtor is temporarily unable to make her full monthly student loan payments, this case does not present such an instance.

Finally, the Court turns to the question of the Debtor's reasonably reliable future income. ECMC argues that the Debtor has failed to demonstrate that her current financial condition will continue. The Court disagrees. The Debtor's testimony regarding the course of her disease, as it has affected her daily life, is evidence that her disease has been progressive. There is no reason to believe that it is more likely or even just as likely that the course will suddenly and spontaneously change and the Debtor will improve as it is to believe that the disease will continue to progress. Common sense dictates that it is more likely that the Debtor's physical condition will not improve or even that it will continue to worsen.

---

[12] The Court is aware of Judge Hillman's recent decision holding that any future tax liability based on the forgiven balance of the student loan is discharged by the debtor's current bankruptcy. *In re Brunell*, 2006 WL 3581498, *12 (Bankr. D. Mass.).

One question that ECMC's attorney alluded to in final arguments was the possibility that with break-throughs in medical science, the Debtor might be cured. ECMC, however, introduced no evidence that such a break-through is reasonably anticipated by the medical community. In its opposition to the Court's notice regarding the taking of judicial notice, ECMC convincingly argued that the Court should not take judicial notice of the MS Society's web site and thus there is nothing to suggest that there is any factual basis for ECMC's claim that a cure might be found.

The Court notes that ECMC raised the specter of a cure, it then argues that this case does not turn on the definition of MS or the Debtor's prognosis. Yet it urges that the Debtor failed in her burden of proof for precisely those reasons. Specifically ECMC states

> It was stipulated at trial that the Debtor has been diagnosed with multiple sclerosis. See Joint Pretrial, Section G (1). However, no stipulation was made as the [sic] effects, if any, of the multiple sclerosis upon the Debtor. No stipulation was made as to what type of multiple sclerosis the Debtor had. Further, no stipulation was made as to the prognosis and/or future effects, if any, of the multiple sclerosis upon the Debtor. At trial the Debtor did not testify as to her future prognosis (and indeed the Debtor, not being a doctor, would not have been qualified to issue such an opinion). At trial the Debtor did not call an expert witness to testify as to the Debtor's future prognosis and/or future effects, if any, of the multiple sclerosis upon the Debtor. The Debtor did not testify or otherwise explain why the Debtor did not have her treating doctor, or another expert, testify on her behalf at trial.

Objection to Court's Order and Notice (docket #24) at 2-3.

It is stipulated that the Debtor suffers from MS.[13] Her testimony describing the onset of her symptoms versus the symptoms she is currently experiencing is compelling evidence as to

---

[13]This stipulation makes the instant case distinguishable from *In re Garrett*, 180 B.R. 358, 364 (Bankr. D.N.H. 1995), where the diagnosis of MS had not been established.

the progressive nature of her disease. Therefore, even without taking judicial notice of the unfortunate prognosis most individuals afflicted with MS face, there is ample evidence to support a finding that her prospects for future employment are not likely to improve unless there is a dramatic improvement in her physical condition or a major scientific break through. Observing the Debtor for approximately two hours was sufficient for the Court to determine the devastating physical manifestations of the disease.

Although the Court does not believe it is necessary to take judicial notice of expert resources, and indeed finds that upon the evidence submitted at trial, the Debtor has met her burden of proof, such resources provide further support for the conclusion that the Debtor's future prospects for physical improvement are dim. Taking such notice of the progressive nature of MS is not unprecedented.

In *In re Hertzel*, 329 B.R. 221 (6th Cir. BAP 2005), the appellate court concluded that the bankruptcy court had not erred in taking judicial notice of the progressive nature of MS.

> Based on the above, it is clear that a bankruptcy court may take judicial notice of the effect that a debtor's well-known medical condition may have on the debtor's ability to earn a living. When giving its statements regarding the effects of MS, the bankruptcy court did not indicate the source from which it obtained its information. However, even in dictionaries, the disease is defined as a degenerative disorder. The American Heritage College Dictionary defines multiple sclerosis as:
>
>> A chronic degenerative disease of the central nervous system in which gradual destruction of myelin in patches throughout the brain or spinal cord or both interferes with the nerve pathways and causes muscular weakness, loss of coordination, and speech and visual disturbances.
>
> The American Heritage College Dictionary 896 (3d ed.1993). Similarly, Webster's Third International Dictionary defines MS as:

> a chronic progressive disease of the central nervous system marked by a patchy demyelination and hardening of nerve tissue and associated with varied motor and psychic changes depending upon the location of the lesions.
>
> Webster's Third International Dictionary 1486 (3d ed.1993). Therefore, it was not erroneous for the bankruptcy court to take judicial notice of the progressive nature of MS and find that it is unlikely that the Debtor's medical or financial condition will improve.

*Id.* at 232-33.

In Stephen L. Hauser & Douglas S. Goodin, Multiple Sclerosis and Other Demylinating Diseases, in Harrison's Principles of Internal Medicine 2461-71 (16th Ed. 2005),[14] the authors note that "[m]anifestations of MS vary from benign illness to a rapidly evolving and incapacitating disease requiring profound life-style adjustments." *Id* at 2461. The same treatise supports the Debtor's testimony about the debilitating effects of her muscular spasticity, some of which were obvious to the Court, and notes that such spasticity "can interfere with a patient's ability to ambulate or work or with self-care." *Id.* at 2463. It buttresses the Debtor's testimony that she has urinary frequency by noting that "[s]ymptoms of bladder dysfunction are present in [greater than] 90% of MS patients; that she suffers from fatigue by noting that "[f]atigue is experienced by 90% of patients and is moderate to severe in half"and that heat, including heat caused by a hot shower, physical exercise, and febrile illnesses, worsens her symptoms. *Id.* In general the treatise supports the Debtor's testimony about the progressive and increasingly debilitating effects MS has had on her physical condition and her ability to maintain employment.

---

[14]Harrison's Principles of Internal Medicine is a recognized by medical experts as authoritative as well as informative. *Bueno v. U.S.*, 64 F. Supp.2d 627, 630 (W.D. Tex. 1999).

That the Debtor did not call an expert to testify and that she did not explain the lack of such testimony is not surprising despite ECMC's attempts to portray this lack of evidence as Debtor's failure to meet her burden of proof. Just as ECMC has never produced a witness to testify about the specifics of the William D. Ford program and the current and long-range impact of the program upon a particular debtor, debtors frequently do not call expert witnesses to testify about their medical or psychological conditions and the impact on their ability to earn a living. The reason is often obvious as it is in this case: debtors frequently cannot afford to call such experts. Although there are cases where the failure of such evidence can be fatal to a debtor's case, this is not one of those instances.

This case is distinguishable from cases such as *In re Gallagher*, 2006 WL 288225, *3 (Bankr. D.N.H.), in which the debtor did not offer any testimony that her disease impaired her ability to earn a living.

> Although the Plaintiff has been diagnosed with multiple sclerosis, the Plaintiff has not argued, and the evidence does not indicate, that this currently prevents her from repaying her student loan and maintaining at least a minimal standard of living. It is possible, though, that the Plaintiff's illness will one day become an "exceptional circumstance" that would render her hardship "undue." See In re Hertzel, 329 B.R. 221, 232 (B.A.P. 6th Cir.2005) (multiple sclerosis is a degenerative disease and "a bankruptcy court may take judicial notice of the effect that a debtor's well-known medical condition may have on the debtor's ability to earn a living"). On the other hand, the Plaintiff testified that her multiple sclerosis could remain stable for the rest of her life.

Given that the Court was able to observe many of the Debtor's symptoms first-hand and finding that the Debtor's testimony was credible and supported by a leading medical treatise provides more than a preponderance of evidence that the Debtor's current condition, which has

worsened since she first became symptomatic, will continue to impair her ability to find employment that will improve her financial status.

**CONCLUSION**

For the foregoing reasons the Court finds that repayment of the Debtor's student loan would impose an undue hardship and thus should be discharged under 11 U.S.C . § 523(a)(8). Judgment shall enter for the Debtor.

Dated: January 18, 2007

_____
Joel B. Rosenthal
United States Bankruptcy Judge